**In the United States District Court
for the District of Kansas**

---

Case No. 24-cv-2175-TC

---

OAKES AUTO, INC., ET AL.,

*Plaintiffs*

v.

MITSUBISHI MOTORS OF NORTH AMERICA,

*Defendant*

---

## MEMORANDUM AND ORDER

Plaintiffs Oakes Auto, Inc., and DO KCK, LLC, sued Mitsubishi Motors of North America, raising various claims arising out of the parties' commercial relationship. Doc. 142. Mitsubishi moves to dismiss the Complaint and requests partial summary judgment, Docs. 73 and 143, and each side moves to exclude the other's experts, Docs. 146 and 147. For the following reasons, Mitsubishi's motion for partial summary judgment is granted and the other motions are denied as moot.[1]

**I**

**A**

Summary judgment is proper under the Federal Rules of Civil Procedure when the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" when it is necessary to resolve a claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). And disputes over material facts are "genuine" if the competing evidence would permit a reasonable jury to decide the issue in either party's favor. *Id.* Disputes—even hotly

---

[1] Mitsubishi requests only partial summary judgment on Count III. But, as explained in Part II.C, *infra*, there is no subject-matter jurisdiction for Count III.

contested ones—over facts that are not essential to the claims are ir-relevant. *Brown v. Perez*, 835 F.3d 1223, 1233 (10th Cir. 2016). Indeed, belaboring such disputes undermines the efficiency that Rule 56 seeks to promote. *Adler*, 144 F.3d at 670.

At the summary judgment stage, material facts "must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671; *see also* D. Kan. R. 56.1(a)–(c). To determine whether a genuine dispute exists, the court views all evidence, and draws all reasonable inferences, in the light most favorable to the nonmoving party. *See Allen v. Muskogee, Okla.*, 119 F.3d 837, 839–40 (10th Cir. 1997). That said, the nonmoving party cannot create a genuine factual dispute by making allegations that are purely conclusory, *Adler*, 144 F.3d at 671–72, 674, or unsupported by the record. *See Scott v. Harris*, 550 U.S. 372, 378–81 (2007).

The moving party bears the initial burden of showing the absence of any genuine issue of material fact and entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1137 (10th Cir. 2016). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues as to those dispositive matters remain for trial. *Celotex*, 477 U.S. at 324; *Savant Homes*, 809 F.3d at 1137.

**B**

This is principally a contract dispute between Oakes Auto, Inc., and Mitsubishi Motors of North America. The parties executed an agreement that set out the terms of Oakes's Mitsubishi dealership in Kansas City, Kansas. Based on what it perceived as a breach, Mitsubishi terminated the agreement. This lawsuit comprises various claims that Oakes raises regarding that termination and Mitsubishi's own alleged breach. The following explains the context in which the dispute arose.

Plaintiffs Oakes Auto, Inc., and DO KCK, LLC, are Kansas com-panies. Doc. 142 at ¶¶ 2.a.i, 2.a.ii.[2] Defendant Mitsubishi is a California corporation that distributes vehicles to dealers. *Id.* at ¶ 2.a.iv. In 2021,

---

[2] All references to the parties' briefs are to the page numbers assigned by CM/ECF. Additionally, the following facts are uncontroverted or, to the ex-tent controverted, viewed in the light most favorable to Oakes and DO, the nonmoving parties. *See Snyder v. Beam Techs., Inc.*, 147 F.4th 1246, 1259 n.5 (10th Cir. 2025).

Oakes and Mitsubishi entered into a dealer sales and service agreement. *Id.* at ¶ 2.a.x; *see* Doc. 143-4. That agreement was a renewal of the parties' previous contract, which is not at issue here. Doc. 142 at ¶¶ 2.a.viii, 2.a.ix; *see* Docs. 143-2 & 143-3. The agreement incorporated a dealer development plan. Doc. 142 at ¶ 2.a.xi; *see* Doc. 143-5. It set out the terms for Oakes's operation of a Mitsubishi dealership in Kansas City, Kansas. Doc. 142 at ¶ 2.a.vi. Plaintiff DO had no contractual relationship with Mitsubishi but owned the real estate where the dealership was located, and it leased that real estate to Oakes. *Id.* at ¶ 2.a.vii.

The terms of the written agreement with Mitsubishi required Oakes to implement the Mitsubishi Visual Identity program. Doc. 143 at ¶ 25; *see* Doc. 143-5 at 4 (referring to the program as the "Retail Image Program"). In particular, the agreement required Oakes to install "authorized sales and service signs" at the dealership. Doc. 143-4 at 23. It also obligated Oakes to use Mitsubishi's trademarks as instructed and to "promptly discontinue the display and use" of Mitsubishi's trademarks if asked to do so. *Id.* at 33–34. The agreement explained that the failure to install the approved signage would "constitute grounds for termination." *Id.* at 23.

In February 2022, a dispute arose concerning the Visual Identity program. Oakes was displaying a Mitsubishi banner outside its dealership instead of the required signs. Doc. 143 at ¶ 26. Mitsubishi sent Oakes a letter explaining that Oakes was in breach of the dealer sales and service agreement because the banner was not the required signs and it was an unauthorized use of Mitsubishi's trademark. *Id.* at ¶ 27; *see* Doc. 143-8. Oakes responded that it would install the required signs by December 31, 2022. Doc. 143 at ¶ 29; *see* Doc. 143-9. Mitsubishi then asked Oakes to install the required signs by August 1, 2022, and Oakes agreed. Doc. 143 at ¶¶ 31, 32; *see* Docs. 143-10 & 143-11. Although Mitsubishi attempted to help Oakes by sending Oakes a proposal for how Oakes could install the required signs, Oakes did not install the required signs. Doc. 143 at ¶¶ 33, 34; *see* Doc. 143-12.

In July 2022, another dispute arose, this time regarding Oakes's efforts to sell the dealership. Oakes entered into an asset purchase agreement with Benji Auto Mitsu Holdings, LLC. Doc. 143 at ¶ 35. That asset purchase agreement called for Oakes to sell its dealership assets to Benji. Doc. 143-20. Plaintiff DO entered into a related real estate purchase agreement with BE Realty Holdings, LLC. Doc. 143 at ¶ 36. Under that real estate purchase agreement, DO was to sell the real estate where the dealership was located to BE. Doc. 143-21. Both agreements contained a condition that Mitsubishi had to consent to the sale. Doc. 143 at ¶¶ 38, 39.

3

Mitsubishi did not consent. Doc. 143 at ¶ 43. Mitsubishi explained to Oakes that it was concerned that the buyer did not have experience selling new cars, did not live in the Kansas City area, did not submit a floor plan, and had a poor record of profitability. *Id.* at ¶ 44; *see* Doc. 143-13. Oakes then submitted updated asset and real estate purchase agreements to Mitsubishi for reconsideration. Doc. 143 at ¶ 47; *see* Doc. 143-22. The updated agreements brought in a new partner into the deal, Kevin Woody, who had experience in new vehicle sales, would work as a general manager, and would own 15% of the dealership. Doc. 143-22. Mitsubishi objected to the sale again. Doc. 143 at ¶ 49. It explained to Oakes that the updated agreements did not assuage its concerns regarding the deal and that Woody's involvement did not change that fact. Doc. 143-14. Pursuant to Kansas law, Oakes could have challenged Mitsubishi's decision by filing a complaint with the Kansas director of vehicles. *See* Kan. Stat. Ann. § 2416(c). It did not do so. Doc. 143 at ¶ 50.

In June 2023, Mitsubishi terminated the dealer sales and service agreement with Oakes. Doc. 143 at ¶ 51. It issued Oakes a notice of termination explaining that Oakes was in breach of the agreement because it had not installed the required signs and had not removed the unauthorized Mitsubishi banner. Doc. 143-15. Once again, Oakes could have but did not exercise its right under state law to challenge the termination with the Kansas director of vehicles Doc. 143 at ¶ 52; *see* Kan. Stat. Ann. § 2414(b).

In addition to the aforementioned disputes, Oakes takes issue with how Mitsubishi allocated vehicles and handled vehicle orders. In general, Oakes asserts that Mitsubishi had an allocation policy but that it failed to follow that policy. Doc. 155 at ¶¶ 84, 85. For example, Oakes argues that Mitsubishi could have honored Oakes's requests for certain vehicles but chose not to do so. *Id.* at ¶¶ 80, 81. Oakes also asserts that Mitsubishi reserved roughly 10-15% of available vehicles for "discretionary allocations" and that Mitsubishi used those discretionary allocations to harm Oakes. *See id.* at 19.

Oakes also takes issue with certain Mitsubishi incentives. In general, Oakes asserts that Mitsubishi declined to give it certain incentives because Oakes had not implemented the Visual Identity program. Doc. 155 at ¶ 158. Oakes also asserts that it could not fulfill the requirements to obtain certain incentives given the discriminatory allocation scheme described above. *Id.* at ¶ 157.

Based on these facts, Oakes and DO filed suit in federal court. Doc. 142. They initially brought six counts but subsequently dismissed

Count V. Doc. 139. In Count I, Oakes argues that Mitsubishi breached the dealer sales and service agreement by requiring Oakes to comply with the Visual Identity program, withholding consent to the sale of the dealership, implementing a discriminatory allocation policy, not honoring Oakes's vehicle orders, and denying Oakes certain incentives. Doc. 142 at ¶ 4.a.I. In Count II, Oakes argues that the same conduct violated the Automobile Dealers Day in Court Act, 15 U.S.C. §§ 1221–1226. *Id.* at ¶ 4.a.II. In Count III, Oakes argues that the same conduct violated the Kansas Dealers and Manufacturers Licensing Act, K.S.A. §§ 8-2401–8-2447. *Id.* at ¶ 4.a.III. In Count IV, Oakes argues that the same conduct violated Mitsubishi's fiduciary duty owed to Oakes. *Id.* at ¶ 4.a.IV. And in Count VI, DO argues that Mitsubishi tortiously interfered with its business expectancy by declining to consent to the sale of the dealership, which led to the failed agreement to sell the real estate. *Id.* at ¶ 4.a.VI.

Four motions are currently pending. Mitsubishi moves to dismiss Counts II and VI, arguing that Oakes and DO have not stated a claim upon which relief can be granted. Doc. 73. Mitsubishi also moves for partial summary judgment, repeating its arguments as to Counts II and VI and arguing that Count I fails because Oakes has not established the elements of a breach of contract, that Oakes is not entitled to some of the damages it requests in Count III, and that Count IV fails because Mitsubishi did not owe Oakes a fiduciary duty. Doc. 143. Oakes and Mitsubishi have also filed motions to exclude each other's experts. Mitsubishi seeks to exclude Oakes's damages expert. Doc. 146. And Oakes seeks exclusion of Mitsubishi's expert concerning the propriety of Mitsubishi's allocations. Doc. 147.

## II

Mitsubishi requests summary judgment on four counts and partial summary judgment on Count III. There is no subject-matter jurisdiction to consider Count III, and the others fail as a matter of law. Accordingly, Mitsubishi's motion for summary judgment, Doc. 143, is granted as to all claims, and, as a result, the other motions, Docs. 73, 146, and 147, are denied as moot. *See Adhealth, Ltd. v. Portercare Adventist Health Sys.*, 135 F.4th 1241, 1245 n.3 (10th Cir. 2025) (affirming the district court's denial of a motion to exclude testimony as moot); Doc. 146 at 1 (noting mootness if summary judgment is granted).

## A

In Count I, Oakes asserts that Mitsubishi breached the dealer sales and service agreement. Doc. 142 at ¶ 4.a.I. Under Kansas law, a

breach-of-contract claim has five elements: the existence of a contract, sufficient consideration, the plaintiff's performance or willingness to perform, the defendant's breach, and resultant damages.[3] *Stechschulte v. Jennings*, 298 P.3d 1083, 1098 (Kan. 2013). Relevant here, "a breach of contract claim is a material failure to perform a duty arising under or imposed by agreement . . . ." *David v. Hett*, 270 P.3d 1102, 1109 (Kan. 2011); *see* Restatement (First) of Contracts § 312 (1932) ("A breach of contract is a non-performance of any contractual duty of immediate performance."). Thus, a breach of contract lies when the defendant breaches "a duty arising from the specific terms of a negotiated agreement." *10th St. Med., Inc. v. State*, 210 P.3d 670, 676 (Kan. Ct. App. 2009).

Mitsubishi requests summary judgment, arguing *inter alia* that Oakes has not established that Mitsubishi breached the agreement. Doc. 143 at 34–38. As explained below, Oakes's claim fails as a matter of law for at least two reasons. The first is procedural—Oakes's summary judgment response fails to specify the contractual provision or language at issue and the conduct Mitsubishi undertook that constituted the alleged breach. *Contra* Doc. 155 at 40. The second is because, even when attempting to construe (or, more appropriately, construct) Oakes's argument, the evidence fails to create a triable issue of material fact.

**1**

Oakes's summary judgment papers fall short of the Rule 56 obligations. In order to stave off summary judgment, Rule 56 requires the non-moving party to come forward with evidence that there is a genuine dispute of material fact that, if resolved in its favor by a jury, would justify judgment in its favor. *See Delsa Brooke Sanderson v. Wyoming Highway Patrol*, 976 F.3d 1164, 1174 (10th Cir. 2020) (noting that a fact is material "if under the substantive law it is essential to the proper disposition of the claim"). But Oakes has failed—in both its summary judgment papers and the Pretrial Order—to point to specific contractual obligations that it contends Mitsubishi violated or specific

---

[3] A federal court sitting in diversity must apply the choice-of-law rules of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). The parties agree that Kansas law applies to every count except Count II, which is governed by federal law. Doc. 142 at ¶ 1.d. *But see* Doc. 143-4 at 5 (provision stating that the dealer sales and service agreement is governed by California law). That law arises from state statutes and decisions of a state's highest court. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).

evidence in the record reflecting that Mitsubishi engaged in conduct that failed to abide by those promises it made. Instead, Oakes simply asserts generally that Mitsubishi breached the agreement and assumes that is enough to survive summary judgment. Also absent is any citation to controlling law supporting Oakes's contention that its construction of the agreement, when compared to Mitsubishi's conduct, constitutes a breach. Instead, Oakes's arguments are more rhetorical than substantive. That is not how summary judgment works. *See Rocky Mountain Wild, Inc. v. United States Forest Serv.*, 56 F.4th 913, 927 (10th Cir. 2022) ("[J]udges are not like pigs, hunting for truffles buried in briefs."); *see also id.* (noting that a court "will not scour the record to determine whether evidence exists that might require the case to go to a jury"); *Zisumbo v. Ogden Reg'l Med. Ctr.*, 801 F.3d 1185, 1197 (10th Cir. 2015) (rejecting contract claim because the plaintiff failed to "identify any specific provisions" that created a duty, and noting that the "failure to cite legal authorities and portions of [the] record" may constitute forfeiture).

For example, Oakes asserts that "extensive evidence exists that [Mitsubishi] breached . . . the express terms of the [agreement]." Doc. 155 at 41. But Oakes does not cite, let alone explain, *which* express terms were breached or how. *Id.* at 41–42 (alluding only in passing to two sections of the agreement). Instead, Oakes avers in only cursory fashion to various sections of the agreement but does not engage with their language or explain how the language of any provision created a duty. For example, Oakes's argument that Mitsubishi breached the agreement's (and the covenant of good faith and fair dealing's) obligation to deliver cars points to fifty-nine statements of fact without any discussion of or engagement with the language of the agreement or the acts and/or omissions of Mitsubishi that breached the agreement. *Id.* at 41 (citing to "SOF 79-138"). Those statements are vague and unhelpful, as exemplified by Doc. 155 at ¶ 79, which contains four citations, one of which points only generically to Section IV.G. of the agreement. And the agreement, as Mitsubishi notes, retains significant discretion for Mitsubishi's consideration of dealer orders in light of the circumstances. Doc. 163 at ¶ 79; *see* Doc. 143-4 at 16. Yet Oakes fails to address any of that.

That is not an isolated example. Oakes repeats that same strategy for the other two alleged violations. Doc. 144 at 41-42 (referring generically to the contract, arguing the conduct was unreasonable, and citing general statements).

**2**

Generally speaking, federal courts should not construct a party's argument for it. *Margolin v. Nat'l Ass'n of Immigr. Judges*, 146 S. Ct. 1285, 1287 (2026) (reversing summarily the Fourth Circuit's construction of an argument that was not made by the prevailing litigant). But, out of an abundance of caution, the following analysis attempts to piece together the best argument Oakes might be attempting to make in opposition to Mitsubishi. Even on that charitable view of the dispute, Oakes's claim fails.[4]

Oakes first argues that Mitsubishi breached the agreement by denying Oakes's vehicle orders and allocating vehicles "arbitrarily" and "unfairly." Doc. 155 at 41. Oakes seemingly grounds this argument on Section IV.G of the agreement. Doc. 155 at ¶ 79. That provision states:

> **G. Minimum Vehicle Inventories**
>
> Subject to the ability of MMNA to supply MMNA Vehicles ordered by Dealer, Dealer agrees that it shall, at all times, maintain the minimum inventory of MMNA Vehicles for immediate sale as set forth in the Dealer Development Plan from time to time by MMNA after consultation with Dealer. Dealer also agrees that it shall have available at all times, for purposes of showroom display and demonstration, the number of current models of MMNA Vehicles required of Dealer as determined from time to time by MMNA after consultation with Dealer. Dealer agrees to maintain all MMNA Vehicles in excellent condition at all times. Failure of Dealer to maintain the required minimum number of MMNA Vehicles shall constitute grounds for termination of this Agreement under Section X.B.2.(n) hereof.
>
> Dealer recognizes that it is the goal of all MMNA Dealers to meet efficiently the needs of all customers of MMNA Products wherever located and that, although an MMNA Dealer may attempt to continually maintain its minimum inventory, occasionally its customers may

---

[4] It seems likely that the absence of specifics as to Oakes's summary judgment position is attributable to doing the best with what the evidence supports. In other words, this resolution and resulting analysis is not intended to be (nor should it be construed as being) critical of either Oakes or its counsel.

> request a specific MMNA Vehicle or MMNA Part or Accessory which is not currently in stock. Accordingly, Dealer agrees to use its best efforts to cooperate with other MMNA Dealers by providing them with access to information regarding its parts and MMNA Vehicle inventory and whenever possible, trading its MMNA Products to satisfy the needs of a customer of another MMNA Dealer.

Doc. 143-4 at 23. Mitsubishi responds that the plain text of the agreement specifies that Mitsubishi did not have to accept Oakes's orders and did not have to allocate vehicles in any particular manner. Doc. 163 at 12.

Oakes lacks any evidence that Mitsubishi breached this provision of the agreement. *Contra* Doc. 155 at 41. That is because Section IV.G, its the text plainly states, imposes no duty on Mitsubishi—it only imposes duties on Oakes to maintain its minimum vehicle inventory subject to the available supply from Mitsubishi. *See* Doc. 143-4 at 23 (noting throughout that "Dealer agrees" to various obligations regarding its inventory); *see also* Antonin Scalia & Bryan A. Gardner, *Reading Law: The Interpretation of Legal Texts* 56 (2012) [hereinafter *Reading Law*] ("The words of a governing text are of paramount concern, and what they convey, in their context, is what the text means."). That is confirmed by Section IV.G's heading: Minimum Vehicle Inventories. Doc. 143-4 at 23; *see Reading Law* 221 ("The title and headings are permissible indicators of meaning."); *Morris v. Okla. Dep't of Hum. Servs.*, 685 F.3d 925, 936 (10th Cir. 2012) (noting that a provision's headings may serve as a "too[l] available for the resolution of a doubt about [its meaning]"). And as Mitsubishi argues, the plain text of the agreement notes that Mitsubishi "is under no obligation to accept orders from [Oakes] and may accept any order in whole or in part." Doc. 163 at 12 (quoting Doc. 143-4 at 16). The agreement also specifies that Mitsubishi is not obligated to allocate vehicles to Oakes, noting that "nothing in this Agreement shall obligate [Mitsubishi] to deliver to [Oakes] any particular number of [Mitsubishi] [v]ehicles." *Id.* (quoting Doc. 143-4 at 16). Oakes does not explain how Section IV.G or any other section of the agreement imposed a duty on Mitsubishi to accept orders or allocate vehicles.

Next consider Oakes's argument that Mitsubishi breached Section 3 of the agreement by unreasonably withholding its consent to the sale of the dealership. Doc. 155 at 41 (citing Doc. 155 at ¶ 132, which in turn cites Doc. 143-4 at 3). Section 3 of the agreement notes as follows:

### 3. Ownership of Dealer.

MMNA and Dealer recognize that the ability of Dealer to satisfactorily perform this Agreement is conditioned upon the continued active involvement in and/or ownership of Dealer by the following person(s) in the percentage(s) shown (hereinafter referred to as the "Owners"):

[Dan Oakes | President | 100% Owner]

This Agreement has been entered into by MMNA in reliance upon, and in consideration of, the personal qualifications and representations of the above-named owners. Accordingly, except as otherwise provided herein, no change in the active involvement in Dealer's management by the owners and no change in the ownership of Dealer by the owners which results in a change in majority control or interest shall be permitted by Dealer or any owner without the prior written approval of MMNA, which approval *shall not be unreasonably withheld.*

Doc. 143-4 at 3 (emphasis added). Mitsubishi responds that Section 3 has nothing to do with the proposed sale of dealership assets; it deals instead with maintaining personal control over the ownership structure of the entity—Oakes—that Mitsubishi chose as a business partner. Doc. 163 at 13.

Oakes lacks evidence that Mitsubishi breached Section 3 of the agreement by refusing to consent to the proposed sale of the dealership. *Contra* Doc. 155 at 41. To begin with, Oakes has failed to establish that Section 3 is implicated by the sale of assets of a dealership. Under Kansas law, that process is governed by statute and, generally speaking, requires notice to the manufacturer and prescribes the process by which such a proposal should be handled. Kan. Stat. Ann. § 8-2416(a)–(b). Section 3 of the parties' agreement captures a different concern and supplements Kansas law—it ensures that Oakes could not avoid Section 8-2416(b)'s consent requirement by achieving a sale of the dealership through a sale or transfer of the entity that owns the dealership. Section 3 notes that a change "in the active involvement in Oakes's management" and a change "in the ownership of Oakes" required Mitsubishi's consent, which could not be "unreasonably withheld." Doc. 143-4 at 3. The proposed sale of the dealership was a sale of Oakes's *assets*, not a change in the involvement of Oakes's

management or a change in the ownership of Oakes. *See* Doc. 143 at ¶ 35 (undisputed statement of fact that Oakes sought to sell its "dealership assets"); Doc. 143-22 (Asset Purchase Agreement detailing the sale of Oakes's assets).

But even assuming Section 3 applied and required Mitsubishi's consent, there is no evidence that Mitsubishi withheld its consent unreasonably. Oakes does not engage with the text of Section 3 or explain how Mitsubishi breached that Section. It merely asserts that three facts show unreasonableness: that the proposed buyer had experience, that he had previously been approved by Nissan to open a dealership, and that Oakes brought in Woody as a general manager. Yet, Mitsubishi explained its reasons for why that was insufficient. The proposed buyer's experience was inapposite because it dealt with used car sales. Doc. 143-14 at 2. That mattered because there is a "significant" difference between the two. *See id.* at 2–3 (explaining the differences). The proposed buyer's assertion that he was approved by Nissan raised "serious concerns" for Mitsubishi because he "did not provide any documents to back up his claim that he had actually been approved by Nissan . . . ." *Id.* at 3. And Woody's involvement did not alleviate Mitsubishi's concerns given his minor role. *Id.* at 4. Oakes does not contest the factual basis for Mitsubishi's explanation or offer any evidence or legal authority suggesting why that explanation suggests a dispute about the reasonableness of Mitsubishi's conduct. The parties could have agreed to a different standard—e.g., to the satisfaction of Oakes—but they did not. As a result, Oakes has failed to create a genuine dispute of material fact concerning Section 3 even if it applied.

Finally, Oakes argues that Mitsubishi breached the agreement by requiring Oakes to implement the Visual Identity program. Doc. 155 at 42. Without citing any provision of the contract or quoting the language at issue, Oakes asserts that the agreement "did not require Oakes to complete the entire VI, only signs," and that therefore Mitsubishi "had no contractual right" to demand that Oakes complete the entire program. *Id.* That failure is not surprising given the text of the agreement: The agreement expressly required Oakes to "implement all mandatory authorized elements of the [Visual Identity] Program." Doc. 163 at 13–14 (quoting Doc. 143-5 at 4). It also required Oakes to install authorized signs and to use Mitsubishi's trademarks only as directed. Doc. 143-4 at 23, 33–34. Exercising those legal rights, Mitsubishi sent Oakes a letter asking that Oakes install the approved signs and remove the unapproved use of Mitsubishi's trademarks. Doc. 143-8. Oakes, contrary to its current argument that it was not under any obligation to do so, agreed to comply. Doc. 143-11. It then failed to do so. Doc. 143 at ¶¶ 32–34. So, even if Oakes is correct that it only had to comply

11

with the "signs" portion of the Visual Identity program, the undisputed evidence is that Mitsubishi asked Oakes to install the requisite signs and Oakes did not do so. Doc. 143 at ¶¶ 32–34.

**B**

In Count II, Oakes asserts that Mitsubishi breached the Automobile Dealers Day in Court Act, 15 U.S.C. §§ 1221–1226. Doc. 142 at ¶ 142.a.II. Mitsubishi moves for summary judgment, arguing that Count II fails because Oakes has no evidence that Mitsubishi made a wrongful demand to Oakes. Doc. 143 at 28; *accord* Doc. 73 (requesting dismissal under Rule 12 on the same ground). The request is granted because Oakes has no evidence that Mitsubishi coerced or intimidated Oakes.

The Act requires automobile manufacturers "to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer." 15 U.S.C. § 1222. It "creates a new cause of action, other than for breach of contract, which did not theretofore exist, in cases where a manufacturer is guilty of coercion and intimidation in its dealings with its franchise holders, regardless of whether the franchise is terminated." *Dreiling v. Peugeot Motors of Am., Inc.*, 850 F.2d 1373, 1378 (10th Cir. 1988).

The burden is high. "[A]ctionable conduct must clearly involve 'coercion or intimidation or threats of coercion or intimidation'" *Dreiling*, 850 F.2d at 1378 (quoting *Gage v. General Motors Corp.*, 796 F.2d 345, 351 (10th Cir. 1986)). "Coercion or intimidation must include 'a wrongful demand which will result in sanctions if not complied with.'" *Id.* (quoting *Fray Chevrolet Sales, Inc. v. General Motors Corp.*, 536 F.2d 683, 685 (6th Cir. 1976)). "A cause of action exists in favor of the dealer only when the unfair and inequitable conduct of the manufacturer amounts to coercion or intimidation." *Hanley v. Chrysler Motors Corp.*, 433 F.2d 708, 712 (10th Cir. 1970).

Count II fails because Oakes lacks evidence that Mitsubishi made a wrongful demand to Oakes. *Contra* Doc. 155 at 31–36. Oakes offers various arguments in support of a wrongful demand. *Id.* All fail, and each is addressed in turn.

Oakes first argues that the Act does not even require a wrongful demand on the part of the manufacturer. Doc. 155 at 29. That argument runs headlong into controlling precedent from the Tenth Circuit and the uniform view of other circuits to have considered the issue.

12

*Dreiling*, 850 F.2d at 1379 (noting that actionable conduct must include "a wrongful demand which will result in sanctions if not complied with"); *George Lussier Enters., Inc. v. Subaru of New England, Inc.*, 393 F.3d 36, 43 (1st Cir. 2004) ("This Court has held, and we again emphasize, that coercion or intimidation [under the Act] must include a wrongful demand that would result in penalties or sanctions if not complied with."); *Gen. Motors Corp. v. New A.C. Chevrolet, Inc.*, 263 F.3d 296, 326 (3d Cir. 2001) ("The type of coercion or intimidation rendered actionable by the ADDCA occurs only when the automobile manufacturer makes a wrongful demand which will result in sanctions if not complied with."); *Empire Volkswagen Inc. v. World-Wide Volkswagen Corp.*, 814 F.2d 90, 95–96 (2d Cir. 1987) ("Failure to act in good faith under the Dealers' Act can be found only where there is evidence of a wrongful demand enforced by threats of coercion or intimidation.").

*Fox Motors, Inc. v. Mazda Distributors (Gulf), Inc.*, 806 F.2d 953 (10th Cir. 1986), is not to the contrary. *Contra* Doc. 155 at 30 (invoking *Fox*). In *Fox* the Tenth Circuit declined to overturn a jury's verdict that the defendant had violated the Act by attempting to compel termination of a franchise agreement through a discriminatory allocation scheme. 806 F.2d at 960. The circuit explained that a discriminatory allocation scheme can rise to bad faith "when the facts also indicate a design to force dealer termination or achieve some other wrongful objective." *Id.* And finally, the circuit also explained that precedent requires "proof of both unfair treatment and some measure of coercion or intimidation to support a claim." *Id.* at 959. Even if a wrongful demand were not required—and the weight of binding and persuasive precedent suggests it is—Oakes lacks any evidence that Mitsubishi coerced or intimidated it. *Fox* confirmed that proof of both unfair treatment and coercion or intimidation are required. *Id.*

Oakes also argues that Mitsubishi violated the Act by asking Oakes to comply with the Visual Identity program. Doc. 155 at 31. As noted by Mitsubishi, that argument fails. Doc. 163 at 9.

Mitsubishi did not violate the Act by requesting that Oakes implement the Visual Identity program. *Contra* Doc. 155 at 31. Oakes agreed as part of the dealer sales and service agreement that it would implement the program and install the required signs. Doc. 143 at ¶ 25; Doc. 143-4 at 23, 33–34. There is no dispute that Oakes failed to install the required signs. Doc. 143 at ¶¶ 33, 34. Mitsubishi did not make a wrongful demand by simply asking Oakes to abide by the contractual obligations that it owed Mitsubishi as part of the express provisions of the parties' contract. *See Gen. Motors Corp. v. New A.C. Chevrolet, Inc.*, 263 F.3d 296, 326 (3d Cir. 2001) ("A manufacturer does not make a

wrongful demand if it merely insists that the dealer comply with a reasonable obligation imposed by the franchise agreement."); *George*, 393 F.3d at 43 ("Coercion must be actual; the mere fact that a dealer may have felt it had been coerced or intimidated is not sufficient. For example, a manufacturer conditioning continuation of a franchise upon certain conduct, even if characterizable as a threat, cannot constitute forbidden coercion per se. It must appear that the condition was unfair or inequitable.") (brackets, citation, and quotation marks omitted). Simply put, Oakes has no evidence that Mitsubishi coerced or intimidated it by insisting that Oakes perform under the parties' agreement. *See Dreiling*, 850 F.2d at 1379 (finding no violation because a termination "was not used to coerce or intimidate [the dealer]").

Oakes next argues that Mitsubishi violated the Act by employing a "punitive" allocation scheme. Doc. 155 at 33. Once again, most of this argument depends on various conclusory statements that are unsupported by analysis or germane citations. *See, e.g.*, *id.* at 34 (arguing that several facts would "permit a jury to conclude [Mitsubishi's] stated reasons for acting are pretextual," failing to offer evidence of the same, and then citing *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114 (10th Cir. 2005), a case that deals with the *McDonnell-Douglas* framework); Doc. 155 at 33 (arguing that Mitsubishi shipped vehicles to Los Angeles instead of Tacoma to "ensure[ ] Oakes would have insufficient vehicles," and citing *id.* at ¶¶ 88, 89, 107, neither of which supports that premise); *see also id.* at ¶ 84 (citing to "MMNA 15916" and "Oakes 542," which are not in the record); *id.* at ¶ 88 (citing to "Ex. 57-134," which is not in the record); *id.* at 4–6 (Oakes's exhibit list, which does not contain these documents). As best as can be discerned, Oakes's position is that Mitsubishi's discretionary allocation was a pretext to run Oakes out of business, which it speculates was Mitsubishi's ultimate goal. Doc. 155 at 33. Mitsubishi responds that the parties' agreement explicitly set out that Mitsubishi was not obligated to allocate vehicles in any specific manner. Doc. 163 at 9.

Once again, Oakes lacks evidence that Mitsubishi violated the Act vis-à-vis its allocation scheme. *Contra* Doc. 155 at 33. Even if Oakes's is correct about Mitsubishi's motives, it is one thing to show that the reasons Mitsubishi gave for its allocations were weak, implausible, or inconsistent. *See Bryant*, 432 F.3d at 1125 (explaining what constitutes pretext). It is another to show what the Act requires: coercion or intimidation—"a wrongful demand which will result in sanctions if not complied with." *Dreiling*, 850 F.2d at 1379. Oakes identifies no evidence to meet that standard. Additionally, the Act prohibits a manufacturer's bad faith when "performing and complying with the provisions of an automobile franchise . . . ." *Hanley*, 433 F.2d at 710. The

14

franchise agreement in this case explicitly allowed Mitsubishi to do what Oakes contends violated the Act. Doc. 143-4 at 16. Even if the opposite were true and the agreement *required* Mitsubishi to accept Oakes's orders and abide by an allocation scheme, Mitsubishi's failure to do so would not amount to a violation of the Act absent coercion or intimidation. *See Ed Houser Enters., Inc. v. Gen. Motors Corp.*, 595 F.2d 366, 371 (7th Cir. 1978) (affirming summary judgment for the manufacturer because "discriminatory allocation, without the concomitant of coercion, does not constitute conduct proscribed by the Act"); *cf. Fox*, 806 F.2d at 960 (finding a violation because the manufacturer sought to "compel termination of the franchises through [ ] discriminatory allocation"). Oakes has no evidence of coercion or intimidation.

Oakes further argues that Mitsubishi violated the Act by withholding its consent to the sale of the dealership. Doc. 155 at 34. That fails out of the gate, as the Tenth Circuit has rejected Oakes's exact argument. *See Gage*, 796 F.2d at 351 ("General Motors, as the majority shareholder of the dealership corporation, had a legal right not to approve a sale of the corporate assets to Small and to approve the sale to other purchasers. The exercise of these legal rights cannot amount to coercion, intimidation or threats as a matter of law."); *Am. Motors Sales Corp. v. Semke*, 384 F.2d 192, 195–96 (10th Cir. 1967) ("[I]t is not coercion or intimidation for a manufacturer to refuse to accept a person as a dealer because of an honest belief that the prospective dealer lacks either the ability or the financial resources to be a successful dealer."). Even if Mitsubishi's withholding of its consent was arbitrary, "mere arbitrariness on the part of a manufacturer does not constitute a violation of the federal act." *Gage*, 796 F.2d at 351 (citing *Colonial Ford, Inc. v. Ford Motor Co.,* 577 F.2d 106, 110 (10th Cir. 1978)). Moreover, the reasons Mitsubishi identified, as noted earlier, appear legitimate and Oakes points to no evidence to the contrary and identifies no legal authority for its position.

Finally, Oakes argues that Mitsubishi implemented certain incentive programs in a "punitive" and "retaliatory" manner. Doc. 155 at 36. This argument also fails. Even when accepting all factual inferences in Oakes's favor, none of its allegations amount to a violation of the Act. *Contra id.* That is because Oakes has no evidence of a necessary condition of a claim under the Act: coercion or intimidation. *See Fox*, 806 F.2d at 959. ("This circuit has interpreted the statutory language as requiring proof of *both* unfair treatment and some measure of coercion or intimidation to support a claim.") (emphasis added). As noted, coercion or intimidation "must include 'a wrongful demand which will result in sanctions if not complied with.'" *Dreiling*, 850 F.2d at 1379 (quoting *Fray*, 536 F.2d at 685). Mitsubishi is entitled to summary

judgment because Oakes has presented no evidence necessary to support its claim of coercion. *See George*, 393 F.3d at 43 ("[S]ummary judgment is warranted if the dealer has produced no evidence showing that it was subjected to coercion or intimidation by the manufacturer or distributor.") (quotation marks omitted).

## C

In Count III, Oakes argues that Mitsubishi violated the Kansas Dealers and Manufacturers Licensing Act, K.S.A. §§ 8-2401–8-2447. Doc. 155 at ¶ 4.a.III. Mitsubishi requests partial summary judgment, arguing that Oakes is not entitled to some of the damages it seeks. Doc. 143 at 38. But as explained below, Oakes has failed to establish that subject-matter jurisdiction exists and, as a result, Count III is dismissed.

"Federal courts are courts of limited jurisdiction." *Brown v. Buhman*, 822 F.3d 1151, 1155 (10th Cir. 2016). Because subject-matter jurisdiction is "a constitutional prerequisite," a federal court has "an independent duty to ensure" that it has jurisdiction. *Shields L. Grp., LLC v. Stueve Siegel Hanson LLP*, 95 F.4th 1251, 1279 (10th Cir. 2024). "[E]ven in the absence of a challenge from any party . . . a court may *sua sponte* raise the question of whether there is subject matter jurisdiction at any stage in the litigation." *1mage Software, Inc. v. Reynolds & Reynolds Co.*, 459 F.3d 1044, 1048 (10th Cir. 2006) (quotation marks omitted).

The Kansas Dealers Act establishes a regulatory framework that governs vehicle dealers and manufacturers. The Act requires vehicle dealers to have licenses, K.S.A. § 8-2403, sets out reporting requirements, K.S.A. § 8-2408, lays out when a dealer's license may be denied, K.S.A. § 8-2410, and allows dealers to challenge the termination of their franchise agreement by filing a complaint with the Kansas director of vehicles, K.S.A. § 8-2414.

A dealer must exhaust its administrative remedies under the Act before seeking help in court. In Kansas, "[t]he exhaustion doctrine dictates that an administrative remedy be sought and completed before the courts will act." *Jarvis v. Kansas Comm'n on C.R.*, 528 P.2d 1232, 1235 (Kan. 1974). The Kansas Supreme Court "has consistently held that where an administrative remedy is provided by statute, such remedy ordinarily must be exhausted before a litigant may resort to the courts." *NEA-Coffeyville v. Unified Sch. Dist. No. 445, Coffeyville, Montgomery Cnty.*, 996 P.2d 821, 825 (Kan. 2000). Thus, a dealer's failure to exhaust its administrative remedies under the Act precludes judicial action. *See Sandlin v. Roche Labs., Inc.*, 991 P.2d 883, 889 (Kan. 1999).

There is no subject-matter jurisdiction to consider Count III.[5] It is undisputed that Oakes did not exhaust its administrative remedies before filing suit. Doc. 143 at ¶¶ 50, 52. That precludes judicial action. *See Util. Trailer Sales of Kansas City, Inc. v. MAC Trailer Mfg., Inc.*, 734 F. Supp. 2d 1210, 1226 (D. Kan. 2010), *aff'd*, 443 F. App'x 337 (10th Cir. 2011) (dismissing for lack of subject-matter jurisdiction where the dealer did not exhaust its administrative remedies under the Kansas Dealers Act). Mitsubishi seeks only partial summary judgment on Count III, Doc. 143 at 38, but there is no subject-matter jurisdiction to even consider that request. As a result, Count III is dismissed for lack of jurisdiction.

## D

Oakes argues in Count IV that Mitsubishi breached its fiduciary duties. Doc. 142 at ¶ 4.a.IV. Under Kansas law, the elements of a claim of breach of fiduciary duty are the existence of a duty arising from a fiduciary relationship, breach of that duty, and resulting damages. *Stroud v. Ozark Nat'l Life Ins. Co.*, 564 P.3d 725, 731–32 (Kan. 2025) (citing *Schneider v. The Kan. Sec. Comm'r*, 397 P.3d 1227, 1247 (Kan. Ct. App. 2017)). "Under Kansas law, 'a fiduciary relation exists in cases where there has been a special confidence reposed in one who, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one reposing the confidence.'" *Terra Venture, Inc. v. JDN Real Est. Overland Park, L.P.*, 443 F.3d 1240, 1245 (10th Cir. 2006) (quoting *Denison State Bank v. Madeira*, 640 P.2d 1235, 1237 (Kan. 1982)).

Generally speaking, there are two types of fiduciary duties. One includes those "specifically created by contract such as principal and agent," and the other includes "those implied in law due to the factual situation surrounding the involved transactions and the relationship of the parties to each other and to the questioned transactions." *Terra Venture*, 443 F.3d at 1245. "[C]onscious assumption of the alleged fiduciary duty is a mandatory element under Kansas law." *Id.* "An

---

[5] It is not clear that the Kansas Dealers Act provides a private right of action. *See Utility Trailer*, 734 F. Supp. 2d at 1225 n.73 (highlighting the issue). Because Mitsubishi did not raise the issue and Oakes's failure to exhaust its administrative remedies under the Kansas Dealers Act means there is no subject-matter jurisdiction, this Memorandum and Order assumes without deciding that the Kansas Dealers Act provides a private right of action. *See id.* (taking a similar approach).

ordinary business relationship should not be construed as a fiduciary relationship, absent clear intent by the parties." *Id.*

Mitsubishi requests summary judgment, arguing that Oakes has no evidence that the parties had a fiduciary relationship. Doc. 143 at 30. Mitsubishi is correct: There is no evidence suggesting that the parties had a fiduciary relationship. *Contra* Doc 155 at 37. In particular, there is no evidence that Mitsubishi consciously assumed a fiduciary duty, a "mandatory element under Kansas law." *Terra Venture*, 443 F.3d at 1245; *see Rajala*, 919 F.2d at 623 (finding no fiduciary duty because there was no evidence that the defendant "consciously assumed fiduciary duties"); *Stroud*, 564 P.3d at 739 (finding no fiduciary duty because nothing showed that the defendant "assumed a special or peculiar duty to act primarily for [the plaintiff's] benefit") (quotation marks omitted). Instead, the evidence suggests that the parties' relationship was nothing more than an ordinary, arms-length business relationship.[6] *See Stroud*, 564 P.3d at 738 (finding no fiduciary duty because the plaintiff had "not presented facts establishing anything other than a normal business transaction"); *see also Terra Venture*, 443 F.3d at 1246 (rejecting the argument that a fiduciary duty arose because the defendant "controlled so very much of the project," and noting that courts "do not presume the existence of fiduciary duties and extend them to commercial transactions, where parties deal at arm's length for their mutual profit").

Oakes's counterarguments are unpersuasive. It argues that the "facts" of the parties' relationship created a fiduciary duty. Doc. 155 at 37. Specifically, Oakes argues that Mitsubishi "agreed to act in the interest of Oakes." *Id.* (citing *id.* at ¶ 78). But the witness upon whose testimony Oakes relies—Kimberly McKee, Mitsubishi's Dealer Development Director—does not support Oakes's assertion. McKee was asked about Section 2 of the dealer sales and service agreement, which notes that "[i]f, at any time, MMNA determines that a different or revised form of dealer sales and service agreement would better serve

---

[6] This is not an atypical result in the franchisor/franchisee space. *See, e.g.*, *FLB, LLC v. Cellco P'ship*, 536 F. App'x 132, 134 (2d Cir. 2013) (citing *Bevilacque v. Ford Motor Co.*, 125 A.D.2d 516, 519–20 (N.Y. App. Div 1986)) ("[I]t is settled that no fiduciary relationship exists between a franchisor and franchisee."); *Williams v. Dresser Indus., Inc.*, 120 F.3d 1163, 1170 n.41 (11th Cir. 1997) (collecting cases and noting that "[m]ost jurisdictions hold that except in cases of franchise terminations or when a duty is created by the express terms of a contract, courts do not impose general fiduciary obligations upon franchisors").

the interests of the parties, MMNA may . . . offer the new or amended form of agreement to Dealer in its stead." Doc. 143-4 at 2; *see* Doc. 155-9 at 48–49. Oakes's counsel asked McKee whether Section 2 meant that Mitsubishi agreed to act in the best interest of Oakes and McKee replied (after Mitsubishi's counsel objected) in the affirmative. Doc. 155-9 at 49. But Oakes's argument and McKee's statement are a *non sequitur*. Section 2 notes that Mitsubishi would offer Oakes a new agreement if doing so would be in the best interest of both parties. Under Kansas law, proof is required that Mitsubishi agreed to act primarily for Oakes's benefit. *See Stroud*, 564 P.3d at 739 (finding no duty because defendant did not assume to act "primarily" for plaintiff's benefit). Nothing in Section 2 or McKee's statement evinces Mitsubishi's conscious assumption of a fiduciary duty. As a result, Oakes's fiduciary duty claim fails for lack of evidence. *See Dana v. Heartland Mgmt. Co.*, 301 P.3d 772, 786 (Kan. Ct. App. 2013) (finding no fiduciary duty where the parties' contract reflected a "normal relationship").

Oakes alternatively argues that a fiduciary duty arose because Mitsubishi "exerted control" over Oakes and Oakes therefore "was left to *trust* [Mitsubishi]." Doc. 155 at 38, 39 (emphasis in original). This argument, too, fails. "The fiduciary relationship is one that is unique and extremely useful in our society; we will not determine that it is 'implied in law' with great ease or frequency." *Terra Venture*, 443 F.3d at 1246. "[D]efining a fiduciary duty as one of trust and confidence does not mean that any relationship or transaction in which one party reposes trust or confidence in another will establish a fiduciary or confidential relationship . . . ." *Stroud*, 564 P.3d at 735. Instead, Kansas law requires a conscious assumption of the alleged fiduciary duty. *Terra Venture*, 443 F.3d at 1245. Again, Oakes has presented no evidence of such an assumption on the part of Mitsubishi. *See Denison*, 640 P.2d 1243 (finding no fiduciary duty where the plaintiff argued that he "trusted and relied upon" the defendant).

## E

Plaintiff DO argues in Count VI that Mitsubishi tortiously interfered with its business expectancy by declining to consent to the sale

of the dealership.[7] Doc. 142 at ¶ 4.a.VI. In Kansas, the elements of tortious interference with a prospective business relationship are the existence of a business relationship, knowledge of the relationship by the defendant, a reasonable certainty that, but for the conduct of the defendant, the plaintiff would have continued the relationship, intentional misconduct by the defendant, and resultant damages. *Cohen v. Battaglia*, 293 P.3d 752, 755 (Kan. 2013). The requisite intentional misconduct is "predicated on malicious conduct by the defendant." *Turner v. Halliburton Co.*, 722 P.2d 1106, 1115 (Kan. 1986). Malice is "actual evil-mindedness or specific intent to injure." *Pepsi-Cola Bottling Co. of Pittsburg v. PepsiCo, Inc.*, 431 F.3d 1241, 1263 (10th Cir. 2005) (quoting *Turner*, 722 P.2d at 1113); *accord May v. Santa Fe Trail Transp. Co.*, 370 P.2d 390, 395 (Kan. 1962) (noting that an action lies when the inducement is "wrongful and not privileged"); Restatement (Second) of Torts § 766 (1979) (noting that malice refers to "intentional interference without justification").

Mitsubishi moves for summary judgment, arguing that DO's claim fails because there is no evidence that Mitsubishi acted with malice. Doc. 143 at 25; *see* Doc. 73 (requesting dismissal on the same ground). It is correct.

Count VI fails as a matter of law because DO has produced no evidence that Mitsubishi acted with malice toward it. *Contra* Doc. 155 at 29. In particular, there is no evidence that Mitsubishi acted with the intent to injure DO. That failure is fatal to DO's claim. *See Linden Place, LLC v. Stanley Bank*, 167 P.3d 374, 380 (Kan. Ct. App. 2007) (affirming where the defendant "did not intentionally and maliciously urge or induce [the third party] to breach his contract with the plaintiff"); *Turner*, 722 P.2d at 1117 (reversing because there was no evidence of malice). Rather, the uncontroverted evidence shows Mitsubishi exercised its rights as a manufacturer to reject a proposed buyer of the dealership's assets and, as a result of that decision, DO failed to realize an expectation that it hoped would arise if the agreement between Oakes and the

---

[7] DO initially argued that Mitsubishi interfered with its "business expectancy and contracts." Doc. 142 at ¶ 4.a.VI. Tortious interference with a contract and tortious interference with a business expectancy are two different torts. *Cohen v. Battaglia*, 293 P.3d 752, 755 (Kan. 2013). DO clarified in its response that it only pursues a claim of tortious interference with a business expectancy. Doc. 155 at 27. Accordingly, to the extent DO pursued a business expectancy and contracts claim, the contract claim has been abandoned. *See Ave. Capital Mgmt. II, Ltd. P'ship v. Schaden*, 843 F.3d 876, 885 (10th Cir. 2016) (finding that failure to respond to an argument constituted forfeiture).

prospective buyer had succeeded. Claims like DO's have been routinely rejected. *See, e.g.*, *Fresno Motors, Ltd. Liab. Co. v. Mercedes Benz USA, Ltd. Liab. Co.*, 771 F.3d 1119, 1127 (9th Cir. 2014) ("[A]n auto manufacturer who lawfully exercises an unexpired [right of first refusal] cannot be sued for inducing a breach of contract."); *Crivelli v. Gen. Motors Corp.*, 215 F.3d 386, 396 (3d Cir. 2000) ("[T]he exercise of a right of first refusal by GM did not constitute an improper action within Pennsylvania's tort of intentional interference with a contractual relationship."); *Morse v. Ted Cadillac, Inc.*, 146 A.D.2d 756, 757 (N.Y. App. Div. 1989) (finding that an action for tortious interference was without merit where "General Motors simply exercised its right to refuse to enter into a dealership franchise agreement with the plaintiff").

DO's counterarguments are unpersuasive. It argues that there is "ample" evidence of malice and points to various facts: That the proposed buyer had been approved by other manufacturers, that Mitsubishi rejected the second purchase agreement after Oakes brought in someone with experience, that Mitsubishi allegedly approved other individuals with little experience, that Mitsubishi "did not want" the Oakes dealership in Kansas City, and that there are actually no differences between new car operations and used car operations. Doc. 155 at 29. But Mitsubishi's rejection letter addressed these issues. *See* Doc. 143-14 (noting, for example, that the proposed buyer offered no documentation to support his assertion that he had been approved by another manufacturer and that the person whom Oakes brought into the deal would not have sufficient control to make a difference). And, more importantly, there is no indication Mitsubishi even considered DO when making its decision, much less was motivated by a desire to harm DO. Put simply, there is no evidence to suggest Mitsubishi had the requisite "actual evil-mindedness or specific intent to injure" required under Kansas law. *See Pepsi-Cola Bottling Co. of Pittsburg v. PepsiCo, Inc.*, 431 F.3d 1241, 1263 (10th Cir. 2005).

*Burcham v. Unison Bancorp, Inc.*, 77 P.3d 130 (Kan. 2003), does not change this result. *Contra* Doc. 155 at 28 (invoking *Burcham*). In *Burcham*, the Kansas Supreme Court reversed a grant of summary judgment because there were genuine issues of material fact regarding malice. 77 P.3d at 152. That case is distinguishable because it involved a corporate officer's conflict of interest. *See id.* at 146–47. The plaintiff presented evidence suggesting that an officer of the defendant was self-interested when he dealt with a hostile takeover bid. *Id.* at 150. There is no evidence of such a conflict or even a similar conflict suggesting malice in this case. Mitsubishi had no relationship with DO, and there is no evidence that its decision was motivated by malice toward DO. Mitsubishi merely exercised its contractual rights. *See Lloyd v. Quorum*

*Health Res., L.L.C.*, 77 P.3d 993, 1001 (Kan. Ct. App. 2003) (affirming finding of no malice because all the evidence was "mere speculation or . . . an inference upon an inference upon an inference") (quotation marks omitted); *Turner*, 722 P.2d at 1115 (holding that "based upon this record, when all of the facts and the inferences to be drawn therefrom are resolved in favor of [plaintiff], there is no credible evidence to support a finding of actual malice upon the part of the defendants").

### III

For the foregoing reasons, Mitsubishi's Motion for Partial Summary Judgment, Doc. 143, is GRANTED, its Motion to Dismiss, Doc. 73, is DENIED AS MOOT, and its Motion to Exclude, Doc. 146, is DENIED AS MOOT. Oakes and DO's Motion to Exclude, Doc. 147, is DENIED AS MOOT.

It is so ordered.

Date: July 13, 2026                  s/ Toby Crouse
                                     Toby Crouse
                                     United States District Judge